**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RICHARD P. IEYOUB,

      Plaintiff,

    v.

KONINKLIJKE PHILIPS N.V., PHILIPS
NORTH AMERICA LLC, PHILIPS HOLDING
USA, INC. AND PHILIPS RS NORTH
AMERICA, LLC,

      Defendants.

Case No.  2:21-cv-1510

**COMPLAINT**

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Richard P. Ieyoub ("Plaintiff") brings this action against Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), Philips Holdings USA, Inc. ("PHUSA"), and Philips RS North America, LLC ("Philips RS") (collectively "Philips" or "Defendants"), alleging as follows:

## INTRODUCTION

1. Defendants manufacture and distribute a variety of sleep apnea therapy products and solutions[1] across the United States, including millions of continuous positive airway pressure ("CPAP") machines, bilevel positive airway pressure ("BiPAP") machines, and mechanical ventilators.

2. On April 26, 2021, Philips disclosed ongoing issues with their CPAP and BiPAP machines, as well as their mechanical ventilators to their investors in their first quarterly report for 2021.[2]

---

[1] https://www.usa.philips.com/c-e/hs/sleep-apnea-therapy/explore-our-sleep-apnea-solutions (last accessed October 15, 2021).
[2] https://www.results.philips.com/publications/q121 (last accessed October 15, 2021).

3.     In this report, Philips disclosed that they had determined from user reports and testing that there were risks to users related to the degradation of polyester-based polyurethane ("PE-PUR") sound abatement foam used in "certain of Philips' sleep and respiratory care devices currently in use," (collectively "the Devices").[3]

4.     Nearly two months after disclosing the issues to their investors, on June 14, 2021, Defendants disclosed the risks associated with the sound abatement foam to the users of the Devices by issuing a voluntary recall.[4]

5.     These risks include that the PE-PUR foam may degrade into particles which may enter the Device's air pathway and be ingested or inhaled by the user as well as the risk that the foam may off-gas certain chemicals.

6.     Philips further advised in its recall notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."

7.     Patients with CPAP and BiPAP machines were advised to discontinue use of the machines except in circumstances where there was a lack of alternatives.

8.     Users of life-sustaining mechanical ventilators were advised not to stop the therapy without consulting a physician.

9.     There have been more than 100 reported injuries and more than 1,200 complaints made to the FDA.[5]

---

[3] Id.
[4] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed October 15, 2021).
[5] https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed October 15, 2021).

10.    Philips has indicated that they will repair or replace the Devices, but anticipates that it will take a year to complete replacement of the recalled devices,[6] leaving CPAP and BiPAP machine users to either risk not using the device for an unknown period of time or to spend money out of pocket to get a different device. Users of mechanical ventilators will have to continue to use the devices despite the clear risks to their health.

11.    Plaintiff purchased one of the Devices, a Philips Respironics System One, on or about October 18, 2016.

12.    By the end of 2016, Plaintiff began to experience soreness in the left jaw and gum area.

13.    In 2017, Plaintiff was diagnosed with a T2 N0 M0 squamous cell carcinoma of the left retromolar trigone.

14.    Plaintiff has now incurred substantial expenses for his medical care following his cancer diagnosis. Since being notified of the recall, Plaintiff has experienced anxiety concerning the serious health risks he is facing from possible exposure to off-gassed or degraded PE-PUR Foam in the Devices, including the device used by Plaintiff.

## THE PARTIES

15.    Plaintiff Ieyoub is a resident of East Baton Rouge Parish, Louisiana.

16.    Plaintiff purchased a Device, a Philips Respironics System One, prior to June 14, 2021.

17.    Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the

---

[6] https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (last accessed October 15, 2021).

Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.

18.    Defendant Philips North America LLC is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly owned subsidiary of Royal Philips. Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America. The sole member of Philips NA is PHUSA, which is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.

19.    Defendant Philips Holding USA, Inc is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is the sole member of Defendant Philips NA.

20.    Defendant Philips RS North America LLC is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

<u>**JURISDICTION AND VENUE**</u>

21.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

22.    Venue is proper because Philips RS North America LLC (formerly Respironics, Inc.) is headquartered in and regularly conducts business in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

4

## GENERAL FACTUAL ALLEGATIONS

23.    Defendants manufacture and distribute millions of CPAP machines BiPAP machines, and mechanical ventilators, including the Devices.

24.    CPAP machines provide a steady flow of oxygen to users' noses and mouths while they sleep, preventing obstructions from blocking airways and causing the frequent waking associated with sleep apnea.

25.    BiPAP machines are ventilators, which improve the level of oxygen in the blood by delivering more air pressure when the user breathes in, and decreasing air pressure when the user breathes out.

26.    Both CPAP and BiPAP machines are relied upon by users with obstructive sleep apnea to relieve the symptoms of their condition, which if left untreated can lead to congestive heart failure, coronary artery disease, stroke, or even death.

27.    On April 26, 2021, Philips disclosed ongoing issues with the Devices to its investors in its first quarterly report for 2021.[7]

28.    In this report, Philips disclosed that it had determined from user reports and testing that there were risks to users related to the degradation of PE-PUR sound abatement foam used in "certain of Philips' sleep and respiratory care devices currently in use."

29.    Nearly two months after disclosing the issues to their investors, on June 14, 2021, Defendants disclosed the risks associated with the sound abatement foam to the users of the Devices by issuing a voluntary recall.[8]

---

[7] https://www.results.philips.com/publications/q121 (last accessed October 15, 2021).
[8] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed October 15, 2021).

30.    The list of Devices includes:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[11] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
|---|---|
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | Continuous Ventilator, Non-life Supporting |

31.    The Devices were manufactured between April 11, 2007 and April 22, 2021 and distributed between July 21, 2009 and April 22, 2021.

32.     When the PE-PUR foam degrades, black debris from the foam and/or certain chemicals off-gassed during the degradation process may be inhaled or swallowed by the user of the Device.

33.     The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam performed by Philips revealed the presence of potentially harmful chemicals, including Toluene Diamine, Toluene Diisocyanate, and Diethylene glycol.[9]

34.     The foam particles may cause irritation and airway inflammation, which may be particularly risky for patients with underlying lung diseases or reduced cardiopulmonary reserve.

35.     The potential symptoms of particulate exposure from degraded foam include irritation (*e.g.*, skin, eye, and respiratory tract), cough, inflammatory response, headache, asthma, chest pressure, sinus infection, other respiratory issues,  adverse effects to other organs (*e.g.*, kidneys and liver), and toxic and carcinogenic effects.[10]

36.     Lab testing completed by Philips also identified the presence of Volatile Organic Compounds (VOCs), which may be emitted as gases from the PE-PUR foam. These VOCs included Dimethyl Diazine and Phenol, 2,6-bis (1,1 dimethylethyl)-4-(1-methypropyl)-.

37.     These VOCs may cause irritation and airway inflammation which may be particularly risky for patients with underlying lung diseases or reduced cardiopulmonary reserve.

---

[9] https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed October 15, 2021).
[10] https://www.usa.philips.com/healthcare/e/sleep/communications/src-update (last accessed October 15, 2021).

38.    The potential symptoms of chemical exposure due to off-gassing include headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, and toxic and carcinogenic effects.

39.    The risk of the PE-PUR foam degradation may be increased by the use of certain cleaning methods, such as ozone, and high heat and high humidity environments.

40.    Patients with CPAP and BiPAP machines were advised to discontinue use of the machines except in circumstances where there was a lack of alternatives.

41.    Users of life-sustaining mechanical ventilators were advised not to stop the therapy without consulting a physician.

42.    Philips has indicated that they will repair or replace the Devices.

43.    Philips' offer to repair and replace is insufficient to remedy the economic harm created by the money already spent by Plaintiff, as well as medical harm, which may be long-lasting and/or incurable.

44.    Furthermore, Defendants have indicated that the Devices may be repaired under warranty, but that further information regarding replacing the Devices is not yet available.

45.    Philips anticipates that it will take a year to complete replacement of the recalled devices,[11] leaving CPAP and BiPAP machine users to either risk not using the device for an unknown period of time or to spend money out of pocket to get a different device. Users of mechanical ventilators will have to continue to use the devices despite the clear risks to their health.

**PLAINTIFF'S SPECIFIC ALLEGATIONS**

46.    Plaintiff Ieyoub was diagnosed with obstructive sleep apnea over forty years ago.

---

[11] https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (last accessed October 15, 2021).

47.     After receiving a prescription from his/her doctor, Plaintiff purchased and began using a Philips Respironics System One, on or about October 18, 2016.

48.     Plaintiff's device is one of the Devices.

49.     Plaintiff used his device daily while sleeping.

50.     At all times, Plaintiff used the device in accordance with the guidelines, manual, and instructions provided with the device as well as those provided by his doctor.

51.     At all times, Plaintiff used his device for a purpose for which the device was marketed, designed, and intended.

52.     Plaintiff began experiencing symptoms including soreness in the left jaw and gum area within a few months after he began using his device.

53.     Plaintiff was diagnosed with squamous cell carcinoma of the left retromolar trigone in 2017.

54.     Plaintiff learned of the recall from the shop where he purchased his device.

55.     Plaintiff ceased using the device after learning of the recall.

56.     Plaintiff's use of the device caused or significantly contributed to his development and progress of his cancer, which has permanently changed his life.

57.     Because of his use of the device in the manner by which it was prescribed and according to the manufacturer's instructions, Plaintiff has been required to undergo significant treatment, will require significant treatment in the future, and now requires constant and continuous medical monitoring and treatment due to the defective nature of the device and/or Defendants' wrongful conduct.

58.     In addition to the substantial physical difficulties suffered by Plaintiff, Plaintiff has endured and will continue to endure significant emotional distress.

## TOLLING AND ESTOPPEL

**DISCOVERY RULE TOLLING**

59.     Plaintiff had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Devices.

60.     Plaintiff could have not discovered, through the exercise of reasonable care, the conduct by Philips alleged herein. Further, Plaintiff did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

61.     For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff.

**FRAUDULENT CONCEALMENT TOLLING**

62.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff.

63.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff. Plaintiff was unaware of the facts alleged herein without any fault or lack of diligence on his part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff should be tolled.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCT LIABILITY- DESIGN DEFECT

64.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

65.     At all times herein mentioned, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

66.     Plaintiff's device is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design.

67.     The Devices are defective in design because they cause headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, cough, inflammatory response, asthma, chest pressure, sinus infection, other respiratory issues, and adverse effects to other organs (*e.g.*, kidneys and liver), and have toxic and carcinogenic effects.

68.     The defective condition of Plaintiff's device rendered it unreasonably dangerous and/or not reasonably safe, and the device was in this defective condition at the time it left the hands of Defendants. Plaintiff's device was expected to and did reach Plaintiff and his physician without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

69.     Plaintiff used his device in accordance with the manufacturers and his doctors' instructions and directions.

70.     Plaintiff's device has not been materially altered or modified prior to or during its use by Plaintiff.

71.     Plaintiff's device is defective because the PE-PUR foam can degrade, causing black particles to enter the device and then Plaintiff's airways, and the degradation of the PE-PUR foam leads to off-gassing of hazardous chemicals.

72.     At or before the time the Devices were released on the market and Plaintiff's device was sold to Plaintiff, they possessed the defect that rendered them unreasonably dangerous.

73.     Defendants could have designed the Devices to make them less prone to causing the above listed health harms, a technically feasible safer alternative design that would have prevented the harm Plaintiff suffered without substantially impairing the function of the device.

74.     Plaintiff could not have known, nor could he have discovered through reasonable means, the defects present in the Devices prior to Defendants' recall.

75.     Defendants knew or should have known that the Devices, including Plaintiff's device, would be prescribed to patients and that physicians and patients were relying on them to furnish a suitable device. Further, Defendants knew or should have known that patients for whom the Devices would be used, such as Plaintiff, could be and would be affected by the defective design and composition of the devices.

76.     Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective device which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

77.     As a direct and proximate result of Defendants' placement of the Devices into the stream of commerce and Plaintiff's use of the product as designed, manufactured, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical and

mental injury, harm, damages, and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT II
## STRICT PRODUCT LIABILITY- MANUFACTURING DEFECT

78.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

79.     At all relevant times, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

80.     At all relevant times, Defendants advertised, promoted, marketed, sold, and distributed the Devices, including Plaintiff's device.

81.     Plaintiff's device was expected to and did reach Plaintiff without a substantial change in its condition.

82.     The devices are more dangerous than other available devices indicated for similar conditions and uses, and the utility of the device does not outweigh its risks.

83.     The Devices deviated, in terms of construction and quality, from the manufacturing specifications or planned output in a manner that made them unreasonably dangerous.

84.     At all relevant times, the Devices, including Plaintiff's device, were defectively and improperly manufactured and designed by Defendants in that Defendants continued to supply consumers with the Devices despite having full knowledge that the devices posed substantial and avoidable bodily injury.

85.     The foreseeable risks of the Devices were known and could have been avoided.

86.     At all relevant times, the Devices were defectively manufactured by Defendants in that their design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

87.     At all relevant times, Defendants actively deceived users that their use of the Devices posed safety risks that far outweighed any benefits.

88.     Furthermore, the Devices, including Plaintiff's device, were defectively manufactured in that the PE-PUR foam comprising part of the devices can degrade into particles that enter the devices' air pathway and can off-gas certain chemicals. Plaintiff was unknowingly subjected to receiving different doses of toxins, carcinogens, and other deleterious components and contaminants when using Plaintiff's device.

89.     As a direct and proximate result of the Devices' defects as described herein, Plaintiff developed cancer, suffered permanent and continuous injuries, pain and suffering, disability, and impairment. Plaintiff has further suffered emotional trauma, harm, and injuries that will continue into the future. Plaintiff has lost his ability to live a normal life and will continue to be so diminished in the future.

<u>**COUNT III**</u>
<u>**STRICT PRODUCT LIABILITY- FAILURE TO WARN**</u>

90.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

91.     At all relevant times, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Devices, including Plaintiff's device, which are defective and unreasonably dangerous.

92.     At all relevant times, Defendants advertised, promoted, marketed, sold, and distributed the Devices, including Plaintiff's device.

93.     The Devices were expected to and did reach the usual consumers, handlers, and persons coming into contact with said device without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

94.     Defendants each had an independent duty and continuing duty to warn the medical community and Plaintiff's physicians about the significance of the risks of physical harm with the Devices.

95.     Plaintiff used his device in a manner intended and foreseeable by Defendants.

96.     The Devices were defective due to inadequate warnings because Defendants knew or should have known that the Devices created an increased risk of bodily harm and failed to warn the medical community, including Plaintiff's doctors, of the nature of such risks.

97.     Defendants omitted and downplayed the significantly increased health risks caused by the Devices that Defendants knew or should have known from previous testing and research even prior to subject device's FDA approval.

98.     The Devices' labeling and warnings were defective because they omitted and inadequately warned of the device's increased health risks.

99.     Although physicians are supposed to weigh the risks and benefits before prescribing a medical device, Defendants knew that their deliberate omissions would cause physicians, including Plaintiff's physicians, to prescribe the Devices without being able to adequately weigh the health risks.

100.     Defendants' failure to warn existed even after the recall was issued, as they took no steps to inform Plaintiff's doctors of the recall.

101.     If Defendants would have properly warned about the Devices' health risks, no reasonable physician, including Plaintiff's physicians, would have recommended or prescribed the Devices because the potential benefits of less troubled sleep are significantly outweighed by the health risks inherent with these Devices.

102.     Had Defendants reasonably provided adequate warnings of the health risks, such warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have prescribed the Devices and no consumer, including Plaintiff, would have purchased and/or used the Devices.

103.     As a direct and proximate result of the Devices' defects as described herein, Plaintiff developed cancer, suffered permanent and continuous injuries, pain and suffering, disability, and impairment. Plaintiff has further suffered emotional trauma, harm and injuries that will continue into the future. Plaintiff has lost his ability to live a normal life and will continue to be so diminished in the future.

## COUNT IV
## NEGLIGENCE

104.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

105.     Defendants had a duty to individuals, including Plaintiff, to use reasonable care in designing, manufacturing, marketing, labeling, packaging, and selling the Devices, including Plaintiff's device.

106.     Defendants were negligent in failing to use reasonable care as described herein in designing and manufacturing the Devices, including Plaintiff's device. Defendants breached their aforementioned duty by:

   a) Failing to design the Devices, including Plaintiff's device, so as to avoid an unreasonable and increased risk of harm of cancer and other injuries in users;

   b) Failing to design the Devices, including Plaintiff's device, flawed polyurethane PE-PUR sound abatement foam that could degrade and infiltrate the device's air pathway while the user is sleeping, exposing them to increased and unnecessary health risks;

c) Manufacturing the Devices, including Plaintiff's device, with a specific lot and/or lots of flawed polyurethane PE-PUR sound abatement foam that could degrade and infiltrate the device's air pathway while the user is sleeping, exposing them to increased and unnecessary health risks; and

d) Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging, and/or selling the Devices, including Plaintiff's device

107. Defendant also negligently failed to warn or instruct Plaintiff regarding the following issues:

a) the Devices, including Plaintiff's device, were manufactured with flawed polyurethane PE-PUR sound abatement foam which degrades and infiltrates the device's air pathway while the user is sleeping, exposing them to increased health risks;

b) the Devices, including Plaintiff's device, were manufactured with flawed polyurethane PE-PUR sound abatement foam which off-gasses toxic chemicals exposing users to increased health risks;

c) the risk of chronic inflammation resulting from use of the Devices, including Plaintiff's device;

d) the risk of chronic infections resulting from the Devices, including Plaintiff's device;

e) the risk of lung, kidney, and/or rectal cancers from exposure to the foam;

f) the need for corrective or revision surgery to adjust or remove cancerous tumors and/or nodules as a result of usage of the Devices, including Plaintiff's device; and

g) the severity of complications that could arise from use of the Devices, including Plaintiff's device.

108.    As a direct and proximate result of the Devices' defects as described herein, Plaintiff developed cancer, suffered permanent and continuous injuries, pain and suffering, disability, and impairment. Plaintiff has further suffered emotional trauma, harm and injuries that will continue into the future. Plaintiff has lost his ability to live a normal life and will continue to be so diminished in the future.

## COUNT V
## NEGLIGENT MISREPRESENTATION

109.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

110.    Defendants had a duty to exercise reasonable care to those whom they provided device information about the Devices and to all those relying on the information provided, including Plaintiff, his healthcare providers, and the public in general that the Devices had been tested and found to be safe and effective for treating sleep apnea.

111.    Defendants, in the course of selling the Devices, supplied information about the devices through television commercials, advertisements, marketing campaigns, sales representatives, labeling, and warnings.

112.    Defendants breached their duty by misrepresenting the Devices' safety to the medical and healthcare community, to Plaintiff, and the public in general.

113.    Defendants failed to exercise reasonable care because they should have put safety before their profits and provided individuals with the realistic risks and expectations that the Devices could cause serious health risks.

114.    Defendants' representations were made without properly conducting sufficient testing and by providing insufficient warnings about the Devices' potential risks.

18

115.    Defendants' false representations that the Devices were safe for consumers and their failure to disclose material past and existing facts of the Devices' serious health risks were made or omitted with the intent to induce Plaintiff and the public at large to rely upon those facts or omissions.

116.    Plaintiff was unaware and did not know that his device was unsafe for the purpose of treating sleep apnea because it created significant health risks until after he had been exposed to carcinogenic particles and gasses.

117.    Plaintiff justifiably relied on the false representations of Defendants.

118.    Had Defendants reasonably and proposed provided adequate warnings of cancer and other serious injuries, such warnings would have been heeded and no healthcare professional, including Plaintiff's physicians, would have prescribed then Devices and no consumer, including Plaintiff, would have purchased and/or used the Devices.

119.    As a direct and proximate result of the Devices' defects as described herein, Plaintiff developed cancer, suffered permanent and continuous injuries, pain and suffering, disability, and impairment. Plaintiff has further suffered emotional trauma, harm and injuries that will continue into the future. Plaintiff has lost his ability to live a normal life and will continue to be so diminished in the future.

## COUNT VI
## FRAUD

120.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

121.    At all relevant times, Defendants designed manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed the Devices into the stream of commerce.

122.    Defendants knowingly made fraudulent statements regarding the safety of the Devices and the substantial health risks associated with using the devices, all the while intending to deceive Plaintiff and the general public.

123.    At all relevant times, Defendants fraudulently misrepresented the Devices as safe, when in fact the devices posed unreasonable risks of substantial bodily injury. Due to these and other features, the Devices are not fit for their ordinary, intended use as treatment devices for sleep apnea and similar respiratory conditions.

124.    Defendants touted the Devices as safe, despite a failure to adequately research or test the devices to assess their safety prior to marketing and promoting their use.

125.    Defendants further falsely represented the nature and risks associated with the Devices, and their marketing and strategy regarding the same, in general statements to the media, general public, and federal agencies, including the FDA.

126.    Defendants' fraudulent misrepresentations and omissions were material facts that were essential to Plaintiff's decision to purchase his device.

127.    Plaintiff was unaware that Defendants were knowingly concealing these material facts, which Plaintiff relied on to his detriment.

128.    Plaintiff justifiably relied to his detriment on Defendants' fraudulent statements.

129.    Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety of the subject device, and not intentionally deceived by Defendants, he would not have acquired/purchased or used his device.

## COUNT VII
## PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. Ann. §§ 201-1, *et seq.*

130.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

131.    At all times mentioned herein, Defendants' engaged in "trade" or "commerce" in Pennsylvania, as defined by 73 Pa. Cons. Stat. Ann. § 201-2(3), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodit[ies]," or "thing[s] of value" in Pennsylvania.

132.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTCPL") 73 Pa. Cons. Stat. Ann. § 201-3 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . are hereby declared unlawful."

133.    For the reasons discussed herein, Defendants violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, *et seq.* Defendants' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

134.    Defendants repeatedly advertised on the labels and packing for the Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Devices were safe and fit for human use. Defendants failed to disclose the material information that the PE-PUR foam used in the Devices, and therefore the Devices themselves, were unsafe and unfit for human use.

135.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff, to induce them to purchase and use the Devices.

136.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff suffered damages by purchasing his device because he would not have purchased his device had he known the truth: not only that he received a product that was worthless, but one that was actively harmful to his physical health and well-being.

137.    Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiff in the form of the loss or diminishment of value of the Devices, including Plaintiff's device, which allowed Defendants to profit at the expense of Plaintiff.

138.    The injuries Plaintiff sustained were to legally protected interests. The gravity of the harm of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

139.    The losses sustained by Plaintiff necessarily flow from the misrepresentations and omissions of Defendants.

## COUNT VIII
## UNJUST ENRICHMENT

140.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

141.    Plaintiff conferred substantial benefits on Defendants through his purchase of his device. Philips knowingly and willingly accepted and enjoyed these benefits.

142.    Defendants either knew or should have known that the payments rendered by Plaintiff were given with the expectation that the Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Defendants to retain the benefit of the payments under these circumstances.

143.    Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff.

144.    Plaintiff is entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## COUNT IX
## MEDICAL MONITORING

145.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

146.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed the Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

147.    Defendants have reported that users of the Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

148.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (*e.g.*, skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic and carcinogenic effects.

149.    The off-gassing of chemicals from the PE-PUR Foam contained in the Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to

off-gassing from PE-PUR Foam include headache/dizziness, irritation (*e.g.*, eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

150.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[12] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[13] and has been reported to cause Occupational Asthma.[14] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[15]   TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[16] TDA and TDI are potential carcinogens.[17] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[18]

---

[12]   Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed October 15, 2021).

[13]   The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/. (last accessed October 15, 2021).

[14]   Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, https://www.uptodate.com/contents/occupational-asthma-definitions-epidemiology-causes-and-risk-factors/print (last accessed October 15, 2021).

[15]   NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/. (last accessed October 15, 2021).

[16] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*

[17] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[18] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998;

151.    As a direct and proximate result of Defendants' conduct, Plaintiff has been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

152.    As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of suffering serious injury or contracting a serious latent disease and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

153.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

154.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Devices has occurred for users, such as Plaintiff, but the full extent of the injuries will not manifest until later in Plaintiff' life. Thus, because of Defendants' conduct, it

---

Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

is reasonably necessary that Plaintiff be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Devices.

155.    Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT X
## BREACH OF WARRANTY

156.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

157.    Defendants marketed and sold the Devices into the stream of commerce with the intent that the Devices would be purchased by Plaintiff.

158.    Philips expressly warranted, advertised, and represented to Plaintiff that the Devices were safe and appropriate for human use.

159.    Philips made these express warranties to Plaintiff regarding the Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff entered into upon purchasing the Devices.

160.    Defendants' advertisements, warranties, representations, and omissions regarding health risks associated with the Devices, were made in connection with the sale of the Devices to Plaintiff. Plaintiff relied on Philips' advertisements, warranties, representations, and omissions regarding the Devices in deciding whether to purchase and use Philips' Devices.

161.    Defendants' Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

162.    Philips therefore breached its express warranties by placing the Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Devices, and render them worthless.

163.    Defendants were aware, or should have been aware, of the toxic or dangerous health effects of the use of the Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff that he was at risk of developing adverse health effects because of the dangerous PE-PUR Foam used in the Devices.

164.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

165.    The adverse health effects associated with use of the Devices existed when they left Philips' possession or control and were sold to Plaintiff. The dangers associated with use of the Devices were undiscoverable by Plaintiff at the time of his purchase of his device.

166.    As manufacturers, marketers, advertisers, distributors and sellers of the Devices, Philips had exclusive knowledge and notice of the fact that the Devices did not conform to the affirmations of fact and promises.

167.    In addition, or in the alternative, to the formation of an express contract, Defendants made each of the above-described representations and omissions to induce Plaintiff to rely on such representations and omissions.

168.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiff reasonably relied upon such representations and omissions in purchasing and using the Devices.

169.    All conditions precedent to Defendants' liability for its breach of express warranty have been performed by Plaintiff.

170.    Affording Defendants an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Devices to make them safe and healthy for use by Plaintiff, but failed to do so until now.

171.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiff has been damaged because he did not receive the products as specifically warranted by Philips. Plaintiff did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Devices.

172.    Plaintiff seeks actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against the Defendants jointly and severally for damages, including punitive damages if applicable, to which he is entitled by law, as well as all costs of this action, interest, and attorneys' fees, to the full extent of the law, whether arising under the common law and/or statutory law, including:

a.    Judgment for Plaintiff and against Defendants;

28

b.　　Damages to compensate Plaintiff for his injuries, economic losses, and pain and suffering sustained as a result of the use of Defendants' Device;

c.　　Pre and post judgment interest at the lawful rate;

d.　　Punitive damages, if applicable, on all applicable Counts as permitted by the law;

e.　　A trial by jury on all issues of the case;

f.　　An award of attorneys' fees; and

g.　　For any other relief as this Court may deem equitable and just, including but not limited to all reliefs prayed for in this Complaint and in the foregoing Prayer for Relief.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all matters so triable.

Dated: October 21, 2021　　　　　　Respectfully submitted,

/s/ *Edwin J. Kilpela*
Gary F. Lynch
gary@lcllp.com
Edwin J. Kilpela
ekilpela@lcllp.com
Elizabeth Pollock-Avery
elizabeth@lcllp.com
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15221
T (412) 322-9243
F (412) 231-0246

Arthur M. Murray
(*pro hac vice* forthcoming)
Murray Law Firm
625 Charles Avenue, 3rd Floor
New Orleans, LA 70130

*Attorneys for Plaintiff*

29